**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**PEARL OSTERHOUT,** *Individually and as*
*Representative of the Estate of Robert Osterhout,*

                              **Plaintiff,**

          **vs.**                                        **5:14-CV-208**
                                                         **(MAD/DEP)**

**CRANE CO.; FMC CORP.,** *on behalf of its former*
*Peerless Pump and Northern business***;  FOSTER**
**WHEELER LLC; IMO INDUSTRIES INC.; and**
**WARREN PUMPS LLC,**

                              **Defendants.**
_____

**APPEARANCES:**                         **OF COUNSEL:**

**LEVY KONIGSBERG, LLP**                 **JEROME H. BLOCK, ESQ.**
800 Third Avenue, 11th Floor             **KEITH W. BINDER, ESQ.**
New York, New York 10022
Attorneys for Plaintiff

**O'CONNELL & ARONOWITZ, P.C.**          **PAMELA A. NICHOLS, ESQ.**
54 State Street
9th Floor
Albany, New York 12207-2501
Attorneys for Plaintiff

**SEDGWICK, LLP**                        **MICHAEL A. TANENBAUM, ESQ.**
Three Gateway Center, 12th Floor         **DENNIS V. VEGA, ESQ.**
Newark, New Jersey 07102                 **MATTHEW STRAUS, ESQ.**
Attorneys for Defendants Foster
Wheeler, LLC

**K & L GATES LLP**                      **ANGELA DIGIGLIO, ESQ.**
599 Lexington Avenue                     **ERIC R.I. COTTLE, ESQ.**
New York, New York 10020-6030            **NICOLE M. KOZIN, ESQ.**
Attorneys for Defendant Crane Co.

**KELLEY JASONS MCGOWAN**                **CHRISTOPHER P. HANNAN, ESQ.**

**SPINNELLI HANNA & REBER, LLP**
120 Wall Street, 30th Floor
New York, New York 10005
Attorneys for Defendant FMC Corp.

**LEADER & BERKON, LLP**                   **AMY ZUMSTEG, ESQ.**
630 Third Avenue
New York, New York 10017
Attorneys for Defendant Imo Industries
Inc. and Warren Pumps LLC

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

On or about February 7, 2014, Plaintiffs Robert Osterhout ("Mr. Osterhout") and Pearl

Osterhout commenced this action against Defendants in New York State Supreme Court,

Onondaga County.  *See* Dkt. No. 1-1.  The Complaint included allegations that the decedent, Mr.

Osterhout, was injured as a result of exposure to asbestos while serving in the United States Navy

from approximately 1947 to 1952, and while aboard the USS Charles H. Roan (DD-853) ("USS

Roan").  *See id.*

On February 27, 2014, Defendants Foster Wheeler and General Electric Company

removed this action to this Court pursuant to the federal officer removal statute, 28 U.S.C. §

1442(a)(1).  *See* Dkt. No. 1.  Currently before the Court are Defendants Crane Co. and Foster

Wheeler's motions for summary judgment.  *See* Dkt. Nos. 305 and 309.  Also before the Court are

Defendants Crane Co., CBS Corp. and Foster Wheeler's motions *in limine* seeking to preclude the

testimony of Plaintiff's expert, Dr. Steven Markowitz.  *See* Dkt. Nos. 308 and 311.

## II. BACKGROUND

Mr. Osterhout enlisted in the U.S. Navy on August 5, 1947. *See* Dkt. No. 309-1 at ¶ 3. After completing basic training, he boarded the USS Roan on December 15, 1947. *See id.* When Mr. Osterhout boarded the USS Roan, he was ranked a Fireman Apprentice. *See id.*

Mr. Osterhout was deposed on March 12, 13 and 14, May 8 and September 18, 2014. *See id.* at ¶ 4. He testified that he was assigned to the number two aft-fire room during his service aboard the ship. *See id.* Mr. Osterhout served a total of approximately 30 months aboard the USS Roan. *See id.* at ¶ 6. He last served in the fire room aboard the ship on October 17, 1950, and received an "Other Than Honorable" discharge from service in the Navy on August 7, 1951. *See id.*

Mr. Osterhout testified that during his service aboard the USS Roan, he performed work as a check man and burner man. *See id.* at ¶ 7. According to Mr. Osterhout, a check man "worked the valves that control the amount of water going to the boilers, and as the ship called for more steam, you'd have to light more burners, and that would take more water because you were making more steam." Dkt. No. 310-6 at 94.[1] Further, Mr. Osterhout testified that burner men would responsible for lighting and cleaning the burners. *See id.* at 94-96. The check man would be positioned on the second floor of the fire room, while the burner man would be positioned on the lower level. *See id.* at 94-95. According to Mr. Osterhout, he believed that he was aboard the USS Roan for three or four years before he became a check man. *See id.* at 126; Dkt. No. 327-2 at ¶ 8.

As a check man, Mr. Osterhout stood watch and operated the check valves that controlled

---

[1] To avoid confusion, anytime the Court references a specific page number for an entry on the docket, it will cite to the page number assigned by the Court's electronic filing system.

the flow of water to the boilers. *See* Dkt. No. 309-1 at ¶ 9. Moreover, Mr. Osterhout testified to repacking the check valves while the ship was in port. *See id.* Mr. Osterhout was unaware of the maintenance history of any of the check valves, but indicated that many of his shipmates in the fire room frequently worked on these valves, and that he was not the first person to maintain or overhaul any of the check valves associated with the boilers. *See id.*; Dkt. No. 327-2 at ¶ 9. Foster Wheeler did not furnish spare or replacement valve stem packing or packing rings for the check valves. *See id.* at ¶ 10.

As a burner man, Mr. Osterhout was responsible for lighting and cleaning the burners, inserting the burners into the boilers, and monitoring the operation of the burners. *See id.* at ¶ 11. This work was performed while the ship was at sea. *See id.* Mr. Osterhout did not indicate that he ever disassembled, repaired, or fixed the burners. *See id.* Moreover, as a burner man he was responsible for cleaning the tubes inside the boiler while the ship was in port. *See id.* at ¶ 12. This involved using a wire brush to remove the carbon deposits on the tubes. *See id.* The tubes which Mr. Osterhout cleaned were made of metal and contained no asbestos. *See id.* at ¶ 13. The tubes, which would collect soot, slag, and carbon, would have been cleaned several times before Mr. Osterhout boarded the USS Roan. *See id.*

Mr. Osterhout also testified that he repaired the firebrick inside the boiler on two occasions. *See* Dkt. No. 309-1 at ¶ 14. He indicated that, to make this repair, he dug less than two (2) inches into the firebrick wall inside the boiler and subsequently patched up the wall by applying a mortal-like substance to the wall. *See id.* In reviewing the technical manual governing Mr. Osterhout's alleged firebrick repair work, Plaintiff's expert, Captain Moore, confirmed that the Bureau of Ships Technical Manual, drafted by the U.S. Navy, required four (4) inches of firebrick against the first layer of the interior wall of the boiler. *See id.* at ¶ 15; Dkt. No.

310-8 at 62. According to Moore, the manual established that the firebrick and associated mortar discussed by Mr. Osterhout contained no asbestos. *See id.* There has been no indication that any insulation deep within the boilers behind several layers of firebrick was ever exposed during Mr. Osterhout's work. *See id.*

Mr. Osterhout also testified that an asbestos cement surface covered the exterior of the boiler. *See* Dkt. No. 309-1 at ¶ 16. Foster Wheeler did not provide any external insulation for the exterior of the boiler or any piece of equipment in the fire room aboard the USS Roan. *See id.* at ¶ 17.

The USS Roan was laid down on April 2, 1945 and launched on March 15, 1946. *See id.* at ¶ 18. Mr. Osterhout reported to service aboard the ship fifteen (15) months after the ship went into service. *See id.* Pursuant to a contract with the U.S. Navy in 1943, Foster Wheeler furnished four Babcock and Wilcox ("B&W") design "marine type oil-burning, single uptake, air-encased water tube steam generators (boilers)" for the USS Roan. *See id.* at ¶ 19.[2] According to Foster Wheeler, it was "contractually required to provide the boilers and drawings, while B&W was required to provide the instruction manuals on behalf of [Foster Wheeler]." *Id.*[3] Plaintiff, however, denies that the instruction manual was drafted or supplied by a company other than Foster Wheeler. *See* Dkt. No. 327-2 at ¶ 19. In support of this assertion, Plaintiff cites to a

---

[2] A steam generating unit is a complete unit designed and fabricated to fire various fuels, using the resulting heat from the combustion of such fuels to generate steam from feed-water. *See* Dkt. No. 310-9 at ¶ 5 n.1. The resulting steam is sent to the turbine for propulsion of the vessel. *See id.*

[3] In support of this assertion, Foster Wheeler cites to the Affidavit of Thomas Schroppe, who began working for Foster Wheeler in 1962 as a "Proposal Engineer," eventually rising through several senior management positions until his retirement in 1999. *See* Dkt. No. 310-9 at ¶ 1. Currently, Mr. Schroppe acts as a consultant for Foster Wheeler and, as part of his responsibilities, he "review[s] and interpret[s] Foster Wheeler contract documents and other archive records specific to United States Navy and Merchant Marine vessels." *Id.*

manual entitled "Instructions for the Operation and Maintenance of Foster Wheeler Marine Steam Generators Installed in U.S. Navy Destroyers, Instruction Book FWB-1967." *Id.* (citing Dkt. Nos. 327-5, 327-6, and 327-7). Plaintiff points to the fact that the front cover states "Foster Wheeler Corporation," with no mention of B&W and the second page again only lists Foster Wheeler, provides its corporate address, and the date "June, 1944." *Id.*

Prior to Mr. Osterhout's arrival aboard the ship, the boilers would have undergone scheduled maintenance that required workers to open the boilers for inspection and service. *See* Dkt. No. 309-1 at ¶ 20; Dkt. No. 327-2 at ¶ 20. Initial fitting out and shakedown cruises for the ship occurred from September 1946 to January 1947. *See id.* For instance, the access doors on the boilers would have been opened on multiple occasions prior to the decedent boarding the USS Roan. *See id.* at ¶ 21. Navy cleaning requirements, as provided in the Bureau of Ships manual, state that the internal conditions of the waterside of the boiler[4] must be inspected and cleaned every 1,800 to 2,000 operating/steaming hours (75 to 83 days), and the internal conditions of the fireside of the boilers must be inspected and cleaned every 600 operating/steaming hours (25 days). *See id.* Doing so requires opening the access points such as access doors and man-holes. *See id.* When these access points are opened, gaskets must be replaced, and under these requirements, gaskets are rapidly consumed. *See id.*

As described by Mr. McCaffery, Foster Wheeler's Navy expert, Mr. Osterhout, or another sailor in his vicinity, would have to open the boiler access door anytime the "firesides" of the boiler needed to be cleaned, something that occurred frequently on a Navy destroyer such as the USS Roan. *See* Dkt. No. 327-2 at ¶ 22. Mr. Osterhout recalled cleaning the tubes of the boilers

---

[4] The "waterside" of the boiler refers to the inside of all drums, headers, and tubes. *See* Dkt. No. 309-1 at ¶ 21 n.3.

(scrubbing out the inside of the tubes with a wire brush); an activity he claimed doing "more frequently than anything." *Id.* Mr. Osterhout also recalled other sailors opening the boilers to perform this work. *See id.*

In the 450 days that elapsed between the commissioning of the vessel and Mr. Osterhout's first boarding the vessel, sailors would have accessed the interior of the boilers on multiple occasions. *See* Dkt. No. 309-1 at ¶ 23. Each time the access doors to the furnace are opened for fireside inspections and cleaning, the gasket material that seals the doors (which comes in the form of a woven tape material as referenced by Captain Moore) must be replaced with a new gasket. *See id.* The "170 feet per boiler woven asbestos tape" furnished by Foster Wheeler with its original boilers for the USS Roan would have been consumed prior to December 15, 1947. *See id.* According to Foster Wheeler, "[i]f the decedent was exposed to asbestos from scraping old gaskets off the access doors, it would not have been a gasket furnished by Foster Wheeler. Foster Wheeler did not supply any asbestos containing spare or any replacement woven tape/access door gaskets." *Id.*

Plaintiff, however, denies the fact that Mr. Osterhout was not exposed to asbestos from asbestos containing materials, including asbestos gaskets, supplied by Foster Wheeler. *See* Dkt. No. 327-2 at ¶ 23. Plaintiff claims that, "[i]n addition to providing asbestos-containing rope and tape for use as manhole gaskets, Foster Wheeler supplied hundreds of asbestos-containing spare gaskets for use as handhole gaskets with each of its boilers. Mr. McCaffery noted that Foster Wheeler provided 248 replacement gaskets per boiler for the handholes in the economizer – 992 total spare gaskets." Dkt. No. 327-1 at ¶ 26. Captain Moore, Plaintiff's Navy expert, details that in addition to being exposed to asbestos from subsequent replacement gaskets, Mr. Osterhout was exposed to asbestos from these asbestos-containing spares supplied by Foster Wheeler:

Q. Now, did Foster Wheeler supply spare handhole gaskets with the boilers on the Roan?

A. Yes, and that's documented in their bills of material.

Q. Now, were those handhole gaskets used by shipyards during overhaul or availability?

A. Those were onboard for the ship to use. When the ship did – as an example, cleaning watersides would have required replacing the handhole gaskets. . . . So these spares that were provided by the manufacturers, including the spares provided by Foster Wheeler, were there for the ship's crew to use [while at sea], not for other people to use.

Q. So when Mr. Osterhout boarded the Roan approximately 15 months after it was commissioned, would these spares more likely than not have been in use by the crew of the Roan?

*  *  *  *  *

A. Yeah, given the number of spares that were provided and the opportunities – and these spares are relevant to watersides . . . . it's likely that some of these spares remained onboard at the time that he was onboard the ship.

Dkt. No. 327-19 at 186-87.

Crane Co. drawings show that Crane Co. manufactured several valves installed in the number two fireroom on the USS Roan. *See* Dkt. No. 326-1 at ¶ 6 (citing Dkt. No. 326-14). These valves included steam valves, gland sealing valves, feed water valves, and the feed stop and stop check valves ("check valves") on each of the Foster Wheeler boilers. *See id.* (citation omitted). Crane Co. drawing numbers 22012, 17232 and 17233 demonstrate that Crane Co. manufactured and supplied several valves to Foster Wheeler for use on each of the boilers installed on the USS Roan, including each boilers' check valve. *See id.* at ¶ 7.

According to Plaintiff, Crane Co. specified the use of asbestos packing in the boiler check valves. *See* Dkt. No. 326-1 at ¶ 9 (citing Dkt. No. 326-14); *see also* Dkt. No. 326-15 at 12.

Under "list of materials" in the check valve drawing, number thirty corresponds to "packing." *Id.*
Plaintiff contends that the material used for the packing, as described in the check valve drawing,
is identified as symbol 1108 on specification number 33P25. *See id.* (citing Dkt. No. 326-15 at
12). Symbol 1108 refers to "plastic, nonmetallic" packing that is "coil form, asbestos and wire
jacket." *Id.* (citing Dkt. No. 326-18, Bureau of Ships ad Interim Specification number 33P25,
dated October 1, 1942). Plaintiff claims that Crane Co. could have specified several materials for
use as packing in its valves in accord with Navy regulations; however, Crane Co. chose to specify
the use of asbestos-containing packing. *Id.* Moreover, Plaintiff asserts that, as with the check
valves, Crane Co. specified the use of asbestos packing in the other valves that were installed in
the number two fireroom on the USS Roan. *See* Dkt. No. 326-1 at ¶ 10.

Crane Co. "disputes that the drawings Plaintiff refers to show that Crane Co. 'specified'
anything." Dkt. No. 339-2 at ¶ 9. Rather, Crane Co. argues that "the drawings were made to
comply with Navy specifications, not Crane Co. specifications and they depicted the materials
that Navy specifications dictated be included in the valves." *Id.* (citing Dkt. No. 326-16 at 44-
45).

One particular valve Mr. Osterhout recalled was the boiler feed stop and stop check valve
("check valve"). *See* Dkt. No. 326-1 at ¶ 13. Each boiler had a check valve that controlled the
flow of water to that boiler. *See id.* These valves were in constant use and needed to be repacked
on a regular basis. *See id.* at ¶¶ 13-14. This process took a considerable amount of time, so much
so that Mr. Osterhout was unable to repair more than one check valve during a shift. *See id.* at ¶
15. The repair work took this long because the person making the repair would have to
completely clean the old packing out of the valve before installing the new packing. *See id.* This
repair work required use of a wire brush, a hammer, and a scraper, which would be used to dig

9

out and remove all of the old packing from the valves. *See id.* at ¶ 16. Not only did Mr. Osterhout perform repacking work on the boilers' check valves, he was present when others repacked the check valves. *See id.* at ¶ 17.

According to Plaintiff, Defendants knew or should have known about the hazards of asbestos associated with its products prior to Mr. Osterhout's exposure. Despite this knowledge, Plaintiff contends that Defendants failed to warn about the hazards associated with the use of their valves and boilers.

In December of 2013, Mr. Osterhout was diagnosed with malignant pleural mesothelioma, which he attributes to exposure to asbestos supplied by and/or associated with Defendants boilers and valves. Currently before the Court are Defendant Foster Wheeler's and Crane Co.'s motions for summary judgment and motions to exclude the testimony of Plaintiff's medical expert, Dr. Steven Markowitz.

## III. DISCUSSION

### A.    Applicable law

Defendants contend that maritime law applies to this action. *See* Dkt. No. 310-32 at 11; Dkt. No. 305-3 at 3 n.1. Plaintiff argues that, "[w]hether this Court applies New York law or maritime law, Foster Wheeler had a duty to warn about the hazards of asbestos associated with both the original and replacement gaskets used on its boilers." Dkt. No. 327 at 7.

Whether maritime law or New York law applies to Plaintiff's claims against Defendants is a threshold determination that is a question of federal law. *See Crews v. Air & Liquid Sys. Corp.*, No. 7:12-CV-1678, 2014 WL 639685, *2 (N.D.N.Y. Feb. 18, 2014) (citing *Floyd v. Air & Liquid Sys. Corp.*, MDL No. 875, 2012 WL 975615, *1 (E.D. Pa. Feb. 8, 2012); U.S. Const. art. III, § 2;

28 U.S.C. § 1333(1)).  "For maritime law to apply, 'a plaintiff's exposure underlying a products liability claim must meet both a locality test and a connection test.'"  *Id.* (quotation and other citation omitted).  "'The locality test requires that the tort occur on navigable waters or, for injuries suffered on land, that the injury be caused by a vessel on navigable waters.'"  *Id.* (quotation omitted).  "In determining whether the work was on 'navigable waters,' 'work performed aboard a ship that is docked at the shipyard is sea-based work, performed on navigable waters.'"  *Id.* (quotation omitted).

In the present matter, the undisputed facts establish that Plaintiff served in the U.S. Navy aboard the USS Roan from December 1947 through October 1950.  Plaintiff alleges that he was exposed to asbestos related to Defendants' products while aboard the USS Roan, while working in the fireroom.  Based on these allegations, the Court concludes that Plaintiff's claims against Defendants satisfy both the locality and the connection test; and, therefore, the Court will apply maritime law to Plaintiff's claims.

**B.    Summary judgment standard**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law.  *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried."  *Id.* at 36-37 (quotation and other citation omitted).  Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

## C.    Government's contractor immunity

Defendant Foster Wheeler contends that it is entitled to summary judgment pursuant to the "government contractor defense." Dkt. No. 310-32 at 12-20.

In *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), the Supreme Court recognized the government contractor defense, a federal common law doctrine. The Court concluded that the "uniquely federal interest[ ]" of "getting the Government's work done" requires that, under some circumstances, independent contractors be protected from tort liability associated with their performance of government procurement contracts. *See id.* at 504-05.

"The Court looked to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* ("FTCA"), for guidance." *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 78, 87 (2d Cir. 2008) (citing *Boyle*, 487 U.S. at 509-12, 108 S. Ct. 2510). "Under the FTCA, Congress waived sovereign immunity for the government insofar as Congress 'authorized damages to be recovered against the United States for harm caused by the negligent or wrongful conduct of Government employees, to the

extent that a private person would be liable under the law of the place where the conduct occurred.'" *Id.* (quotation and other citation omitted).  "The Act's discretionary function exception, however, carves out from that authorization '[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.'" *Id.* at 87-88 (quotations omitted).

The *Boyle* Court concluded that the protection for discretionary action taken by federal agencies and employees implies some measure of similar protection for government contractors even though they are themselves non-governmental entities.  The Court noted that the exercise of government discretion is inherent to military contracting:

> We think that the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function within the meaning of this provision.  It often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness.

*Boyle*, 487 U.S. at 511.  Accordingly, the Court said,

> permitting "second-guessing" of these judgments through state tort suits against contractors would produce the same effect sought to be avoided by the FTCA exemption. . . .  To put the point differently: It makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production.

*Id.* at 511-12 (citation omitted).  The defense thus protects government contractors from the specter of liability when the operation of state tort law would significantly conflict with the government's contracting interest.  *See id.* at 507.

"Adopting the reasoning employed in several previous court of appeals decisions, the

Court limited 'the scope of [state law] displacement' to instances in which '(1) the United States approved reasonably precise specifications [for the allegedly defectively designed equipment]; (2) the equipment conformed to those specifications; and (3) the [contractor who supplied the equipment] warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.'" *In re Agent Orange*, 517 F.3d at 88 (quoting *Boyle*, 487 U.S. at 512, 108 S. Ct. 2510).  "The first two requirements 'assure that the suit [from which protection is sought] is within the area where the policy of the "discretionary function" would be frustrated — *i.e.*, they assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself.'" *Id.* (quotation omitted).  "The third requirement is imposed because 'in its absence, the displacement of state tort law would create some incentive for the manufacturer to withhold knowledge of risks, since conveying that knowledge might disrupt the contract but withholding it would produce no liability.'" *Id.* (quotation omitted).  "The Court therefore 'adopt[ed] this provision lest [its] effort to protect discretionary functions perversely impede them by cutting off information highly relevant to the discretionary decision.'" *Id.* (quotation omitted).

In the present matter, Plaintiff contends that summary judgment is not warranted on the government contractor defense.  *See* Dkt. No. 327 at 26-29.  The Court agrees.

In *Curry v. Am. Standard, Inc.*, No. 08 Civ. 10228 (S.D.N.Y. Jan. 10, 2011), the district court denied Foster Wheeler's motion for a directed verdict premised on the government contractor defense.  *See* Dkt. No. 327-43 (transcript of oral decision denying motion for directed verdict).  In denying Foster Wheeler's motion, the court emphasized that there was no government regulation prohibiting warnings about asbestos.  *See id.* at 7-11.  Further, the court emphasized that "the government contractor defense was intended for a defense where there had been a

specific government decision and, specifically, government decision probably more appropriately dealing with designs but also dealing with warning that indicates that the government had made a weighing after knowledge relative to the issues, specifically, knowledge potentially from the contractor and then they made the policy decision that for some purpose the government was going to deny it and/or deny the warning or deny the design." *Id.* at 10. The court further indicated that the defense "makes sense where the government for its own purposes" has determined that "it does not want either a particular design or a particular warning but it's not intended to be a complete shield[.]" *Id.* Finally, the court held that, without any evidence in the record that the Navy specifically limited the contractor from providing the warning on its product, the defense is inapplicable. *See id.* at 11.

In *In re Joint E. & S. Dist. N.Y. Asbestos Litig.*, 897 F.2d 626 (2d Cir. 1990), the Second Circuit specifically held that, in failure to warn cases, *Boyle*'s requirement of government approval of 'reasonably precise specifications' mandates that the federal duties be *imposed* upon the contractor. The contractor must show that whatever warning accompanied a product resulted from a determination of a government official, . . . and thus that the Government itself 'dictated' the content of the warnings meant to accompany the product." *Id.* at 630 (emphasis in original). "Put differently, under *Boyle*, for the military contractor defense to apply, government officials ultimately must remain the agents of decision." *Id.*

In the present matter, for the government contractor defense to apply, Foster Wheeler must show that its failure to warn resulted from a discretionary decision by the Navy. Foster Wheeler cannot merely claim that the Navy had general control over the project. *See In re Katrina Canal Breaches Litig.*, 620 F.3d 455, 461 (5th Cir. 2010). Further, the mere rubber stamping of a contractor's decision not to warn is also insufficient. *See Trevino*, 865 F.2d at

1487-88.

Foster Wheeler contends that it was "contractually obligated to provide exact duplicates of previously Navy-specified and approved B&W boilers and drawings. . . .  The Navy, quite simply, dictated what markings, if any, that manufacturers could affix to equipment."  Dkt. No. 342-1 at ¶ 44.  In support of this contention, Foster Wheeler cites to a portion of the affidavit of Thomas Schroppe, in which Mr. Schoppe simply states that Foster Wheeler entered into a contract with the Navy in 1943 to provide B&W boilers and that it "was contractually required to provide the boilers and drawings, while B&W was required to provide the instruction manuals on behalf of FW."  *Id.* (citing Dkt. No. 310-9 at ¶ 5).  This conclusory statement, unsupported by any citation to admissible evidence (such as the contract to which he is referring) is insufficient to create a question of fact.  *See Mount Vernon Fire Ins. Co. v. Abesol Realty Corp.*, 288 F. Supp. 2d 302, 309 (E.D.N.Y. 2003) ("When offered to preclude summary judgment, the expert's conclusions must be based on the record and must not be speculative; otherwise, the affidavit does not raise questions of fact sufficient to preclude summary judgment") (citation omitted).

Foster Wheeler also cites to a twenty-one page document (without a specific pin cite) entitled "Interim Military Specification Identification Plates, Information Plates and Marking Information for Identification of Electrical, Electronic and Mechanical Equipment."  *Id.* (citing Dkt. No. 310-18).  First, that document was published on September 19, 1952, after Mr. Osterhout had been discharged from the Navy.  Second, most of the document simply dictates how equipment furnished to the military should be marked so that basic information about can be easily ascertained, *i.e.*, who manufactured the item, when it was manufactured, the contract under which it was procured, and that the equipment is "U.S. Property."  Dkt. No. 310-18 at 4.  The following language is provided under the subsection entitled "Operating characteristics": "Under

this heading shall be entered the information necessary for the safe handling, operating and maintenance of the major unit or set.  An additional space or an additional block may be provided....  The typical operating characteristics for electrical, electronic and mechanical major units and sets shall be as specified in figures 2, 3, and 4 and shall be subject to the approval of the bureau or agency concerned." *Id.*  This language indicates that warning labels were permissible and subject to approval by the relevant agency.  Therefore, even if this document pertained to the applicable time period, it actually supports Plaintiff's position.  Had Foster Wheeler submitted a proposed warning under this provision that the Navy rejected, the government contractor defense could be applicable.  Foster Wheeler, however, has presented no evidence that it provided the Navy with such a warning that was subsequently rejected.

Moreover, according to Captain Moore, the Foster Wheeler Boiler General Arrangement Drawing dated November 18, 1943 and approved by the Navy on April 15, 1944, specifically required "a boiler component to be equipped with a warning plate."  Dkt. No. 327-34 at ¶ 14 (citing Exhibit "5" of Moore Affidavit).  According to Captain Moore, "this drawing illustrates that the U.S. Navy did not prohibit manufacturers from providing warning plates when manufacturers deemed them necessary."  *Id.*

In *Nicholson v. United Technologies Corp.*, 697 F. Supp. 598 (D. Conn. 1988), the plaintiff, who was injured while repairing the landing gear of a military helicopter, alleged that the manufacturer had failed to provide adequate warnings and instructions for the repair of the landing gear.  Since the information brought forth by discovery conclusively established that the government had exercised extensive control over both the original compilation of the landing gear's repair manual and the revisions, the court found sufficient, specific governmental control over the content of the warnings to satisfy the "reasonably precise specifications" element of

17

*Boyle. See id.* at 604. The scope of governmental control over the content of the repair manual in *Nicholson* supported the conclusion that the Government's specifications left no room for any addition by the manufacturer. The extent of governmental involvement in controlling product warnings in this case pales in comparison. Unlike *Nicholson*, the labeling instructions issued by the Government in this case were so few, so minor, and so generic, it would require a long leap of logic to conclude that they removed any ability of Foster Wheeler to augment the labeling.

As Foster Wheeler correctly articulates, under the prevailing view, "an independent contractor does not have to show an express government prohibition on all warnings, but rather, must establish that the government 'exercised its discretion' regarding warnings to be placed on defendant's product." *Faddish v. General Elec. Co.*, No. 09-70626, 2010 WL 4146108, *9 (E.D. Pa. Oct. 20, 2010) (citing *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992 (7th Cir. 1996); *In re Joint Eastern & Southern District New York Asbestos Litigation*, 897 F.2d 626, 630 (2d Cir. 1990); *Kerstetter v. Pacific Scientific Co.*, 210 F.3d 431, 437 (5th Cir. 2000); *Tate v. Boeing Helicopters*, 140 F.3d 654, 660 (6th Cir. 1998); *Butler v. Ingalls Shipping, Inc.*, 89 F.3d 582, 586 (9th Cir. 1996)) (other citations omitted). Even under this standard, however, Foster Wheeler has failed to put forth evidence that the Government exercised such discretion regarding any warnings relating to asbestos.

Questions of fact clearly prohibit the Court from granting Foster Wheelers' motion for summary judgment on this ground. Foster Wheeler has failed to provide relevant evidence that the Navy prohibited it from providing warnings on its boilers or in the accompanying instruction manual. Foster Wheeler continually argues that B&W was responsible for providing the instruction manual for the boilers being provided by Foster Wheeler.

**D.    Duty to warn**

Defendant Foster Wheeler contends that, under maritime law, it is not liable for asbestos-containing component parts it did not manufacture or distribute.  *See* Dkt. No. 310-32 at 22-25.  Pursuant to the maritime law "bare metal" defense, a defendant can only be held liable for those component parts that it manufactured or distributed.  *See id.* at 22 (citing *Lindstrom v. A-C Prod. Liability Trust*, 424 F.3d 488, 494-95 (6th Cir. 2005)).  Similarly, Defendant Crane Co. claims that it is not legally responsible for asbestos-containing materials it did not place into the stream of commerce.  Dkt. No. 305-3 at 6-7.

Products-liability theories, including strict products liability, are well within maritime law.  *See, e.g., E. River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 865 (1986); *Ocean Barge Transport Co. v. Hess Oil Virgin Islands Corp.*, 726 F.2d 121, 123 (3d Cir. 1984).  Absent a controlling statute, maritime law is "developed by the judiciary" and is "an amalgam of traditional common-law rules, modifications of those rules, and newly created rules."  *E. River Steamship*, 476 U.S. at 864-65.

"A manufacturer is liable for harm caused by a product sold 'in a defective condition unreasonably dangerous.'" *Conner v. Alfa Laval, Inc.*, 842 F. Supp. 2d 791, 796 (E.D. Pa. 2012) (quoting Restatement (Second) of Torts § 402A (1965)).  "Liability for defective products has grown into three distinct theories of liability: manufacturing defects, design defects, and defects based on inadequate warnings." *Id.* at 796-97 (citing Restatement (Third) of Torts: Prods. Liab. § 2 (1998) ("A product is defective when, at the time of sale or distribution, it contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warnings")).  And a manufacturer is also liable for the harm resulting from the negligent failure to warn of the risks created by its products.  *See id.* at 797 (citation omitted).

19

The elements of a negligence action under maritime law are "'essentially the same as land based negligence under the common law.'" *Pearce v. United States*, 261 F.3d 643, 647 (6th Cir. 2001) (quoting 1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 5–2, at 170 (3d ed. 2001)). Under maritime law, "to prevail in a negligence action, a plaintiff must establish that the defendant's breach of duty is the but-for and proximate cause of the injury complained of." *In re Deepwater Horizon*, 739 F.3d 790, 828 (5th Cir. 2014). Thus, the threshold question before the Court is whether Defendants owed Mr. Osterhout a duty of care.

A duty of care under maritime law may encompass a failure to warn the plaintiff of harm that is reasonably foreseeable; the duty depends on the defendant's knowledge of the risk. *See Quirin v. Lorillard Tobacco Co.*, 17 F. Supp. 3d 760, 768 (N.D. Ill. 2014) (citing *Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1980); *Filer v. Foster Wheeler, LLC*, 994 F. Supp. 2d 679, 686 (E.D. Pa. Jan. 29, 2014) ("[M]aritime law recognizes both strict product liability causes of action (*i.e.*, defective warning or defective design) and a negligent failure-to-warn cause of action")). The existence of a legal duty, given a set of facts, is a question of law for the court to decide. *See In re Garvey Marine, Inc.*, 424 F. Supp. 2d 1109, 1114 (N.D. Ill. 2006) ("In maritime cases, as in land-based negligence cases, the determination of a legal duty is a question of law").

Defendants contend that Plaintiff has produced no evidence that it supplied or manufactured any asbestos-containing material to which Mr. Osterhout was exposed while working on the USS Roan. Therefore, Defendants contend, it owed no duty to Mr. Osterhout, and Plaintiff cannot meet a threshold requirement for a negligence claim. Defendants' arguments in support of their motions for summary judgment raise two questions. First, did Defendants have a duty to warn Mr. Osterhout of hazards arising from other manufacturer's products, where Defendants did not supply those products? And second, has Plaintiff presented sufficient

evidence to create a triable question of fact as to whether Mr. Osterhout  was exposed to asbestos-containing products that were manufactured or supplied by Defendants themselves? Each question requires the court to carefully examine the evidence in the record, as it applies to each of the moving Defendants.  *See Cabasug*, 2013 WL 6212151, at *6 (emphasizing that in asbestos cases, courts should not apply tests "by rote," but must instead examine "the particular facts presented").

### 1. Duty to Warn of Hazards of Other Manufacturers' Products

Defendants contend that they cannot be liable for a manufacturing defect in an asbestos-containing product that it did not make or supply.  *See* Dkt. No. 310-32 at 22-25; Dkt. No. 305-3 at 6-7.  In *Lindstrom v. A–C Product Liability Trust*, 424 F.3d 488, 494-95 (6th Cir. 2005), for example, the Sixth Circuit granted summary judgment in a maritime asbestos case in favor of a valve manufacturer, where "it would have been impossible for [the plaintiff] to have handled any original packing or gasket material attributable to [the defendant], and the plaintiff did not name the defendant "as one of the companies that manufactured replacement valve packing containing asbestos."  *Id.* at 494.

Both Foster Wheeler and Crane Co. rely on *Lindstrom*, which did not discuss a failure-to-warn claim, however, and the question before the Court at the moment is not whether Defendants are liable for supplying a product in a defective or unreasonably dangerous condition, but whether Defendants were required to warn Mr. Osterhout of hazards related to asbestos-containing materials supplied by third parties that were used in connection with Defendants' products.  *See* Dkt. No. 327 at 14-15 (noting that "[t]he issue before the *Quirin* court is one of the issues facing the Court in this case: under maritime law, when is a defendant liable

for asbestos-containing replacement components that it neither manufactured nor supplied?").

Both Foster Wheeler and Crane Co. point to various cases in which courts have concluded that manufacturers are not liable for the dangers of asbestos-containing replacement parts supplied by a third party. *See, e.g., Floyd v. Air & Liquid Systems Corp.*, No. 2:10-cv-69379, 2012 WL 9765615 (E.D. Pa. Feb. 8, 2012); *O'Neil v. Crane Co.*, 53 Cal. 4th 335, 135 Cal. Rptr. 3d 288, 266 P.3d 987, 995-96 (2012); *Simonetta v. Viad Corp.*, 165 Wash. 2d 341, 197 P.3d 127 (2008); *Braaten v. Saberhagen Holdings*, 165 Wash. 2d 373, 198 P.3d 493, 495-500 (2008). This is sometimes referred to as the "bare metal defense."[5] *Various Plaintiffs v. Various Defendants*, 856 F. Supp. 2d 703, 712 (E.D. Pa. 2012). Although most of these cases were decided under state law, the application of maritime law does not require a different analysis. Indeed, "maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules," and it often relies on state sources. *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 865 (1986). The asbestos multi-district litigation ("MDL") court in Pennsylvania, applying maritime law, has also recognized the "bare metal defense." *Various Plaintiffs*, 856 F. Supp. 2d at 712 (citing *Conner v. Alfa Laval, Inc.*, 842 F. Supp. 2d 791, 800-01 (E.D. Pa. 2012)).

Not all courts have strictly applied this rule, and even the asbestos MDL court has recognized exceptions to it. In *Salisbury v. Asbestos Corp. Ltd.*, MDL No. 875, 2014 WL 345214 (E.D. Pa. Jan. 29, 2014), for example, the asbestos MDL court rejected a shipbuilder's argument that it had no duty to warn about asbestos insulation installed on a ship unless the plaintiff could "establish that the asbestos insulation to which he was exposed is the same asbestos insulation that Defendant originally installed aboard the ship (as opposed to replacement insulation later

---

[5] The Court notes that in New York, the "bare metal defense" is often referred to as the "component parts doctrine." *In re N.Y.C. Asbestos Litig.*, 121 A.D.3d 230, 252 (1st Dep't 2014).

installed by the shipowner)." *Salisbury*, 2014 WL 345214, at *8. The court concluded that it fell to the jury "to determine whether Defendant's failure to warn about the insulation at issue (whether original or replacement insulation) was reasonable under the circumstances." *Id.* Other district courts have broadly construed the duty to warn, so that the foreseeable use of a defendant's product in connection with asbestos-containing materials supplied by a third party created a duty to warn on the part of the defendant. *See, e.g., Chicano v. Gen. Elec. Co.*, No. 03-cv-5126, 2004 WL 2250990, *6 (E.D. Pa. Oct. 5, 2004) (applying Pennsylvania law to find "a genuine issue of material fact as to whether . . . GE could reasonably foresee that its turbines would be combined with asbestos-containing insulation, which together constituted a defective product, absent appropriate warnings of the dangers of asbestos").

The divergent conclusions reached in these cases cannot be completely reconciled. By the Court's reading of the cases, three approaches to the problem at hand have been employed. Some courts have concluded that a defendant is liable whenever the use of asbestos in connection with its product is foreseeable. *See, e.g., Chicano*, 2004 WL 2250990, at *6. Conversely, other courts have concluded that a defendant is never liable when the material containing asbestos was supplied by a third party. *See, e.g., Cabasug v. Crane Co.*, 989 F. Supp. 2d 1027, 1041-42 (D. Haw. 2013). Finally, some courts have followed a middle road, finding a duty where the use of asbestos-containing materials was specified by a defendant, was essential to the proper functioning of the defendant's product, or was for some other reason so inevitable that, by supplying the product, the defendant was responsible for introducing asbestos into the environment at issue. *See, e.g., Salisbury*, 2014 WL 345214, at *8; *Quirin v. Lorillard Tobacco Co.*, 17 F. Supp. 3d 760 (N.D. Ill. 2014).

This Court will follow that middle path. In general, consistent with the bare metal

defense, a manufacturer is not liable for materials it did not supply. But a duty may attach where the defendant manufactured a product that, by necessity, contained asbestos components, where the asbestos-containing material was essential to the proper functioning of the defendant's product, and where the asbestos-containing material would necessarily be replaced by other asbestos-containing material, whether supplied by the original manufacturer or someone else. For example, in *Salisbury*, the defendant shipbuilder used asbestos-containing insulation strips in constructing the ship. The MDL court, which has generally accepted the bare metal defense, concluded that a duty to warn of the hazards of asbestos attached because the shipbuilder itself used asbestos, even if the strips were later replaced with strips made by a different manufacturer. *Salisbury*, 2014 WL 345214, at *8. The California Supreme Court, which approved of the bare metal defense in *O'Neil*, also left room for an exception to the rule. It qualified its conclusion that the defendant, Crane Co., could not be held liable for products manufactured by third parties by noting that "the evidence did not establish that the defendants' products needed asbestos-containing components or insulation to function properly. It was the Navy that decided to apply asbestos-containing thermal insulation to defendants' products and to replace worn gaskets and packing with asbestos-containing components." *Oneil*, 266 P.3d at 1004. Here, in contrast, the record contains sufficient evidence for a reasonable jury to conclude that Defendants' products required asbestos-containing components to function in the high-heat applications for which they were marketed. On those facts, a duty to warn of foreseeable risks could attach.

For example, Foster Wheeler boilers, including the two installed in the after fireroom of the USS Roan, required asbestos-containing material to operate. Foster Wheeler's "Bill of Material and Production List for DD-692 Class Destroyers" evidences that asbestos containing-materials contained in each boiler were provided by Foster Wheeler, including: compressed

gaskets for economizer doors; 170 feet of woven asbestos tape (for use as gasketing material); 200 square feet of asbestos millboard; 38 feet, 6 inches of brass sheathed asbestos insert packing strips; 2 compressed asbestos sheet economizer inlet manifold seals; 2 compressed asbestos sheet economizer outlet manifold seals; and approximately 72 feet of ½ inch diameter asbestos rope (for use as gasketing material). Dkt. No. 327-1 at ¶ 7 (citing Dkt. No. 327-34). External insulation and lagging were also used on and necessary for the safe operation of Foster Wheeler's boilers on Navy and commercial vessels. In fact, the evidence demonstrates Foster Wheeler knew that asbestos-containing insulation would be applied to its boilers because the boiler contract specified it. See Dkt. No. 327-15 at 31-32 (stating that the shipyard will provide the asbestos-containing insulation for the Foster Wheeler boilers; insulation was also listed under the "materials not provided" section of the contract by Foster Wheeler, evidencing Foster Wheeler's knowledge that such materials were ultimately necessary for the safe operation of its boilers). Even Foster Wheeler's own Navy expert concedes that Foster Wheeler was aware of this fact. *See* Dkt. No. 327-12 at 9-10. While Foster Wheeler shipped its boilers to the Navy in parts and without external asbestos insulation, it provided the Navy with engineers to assist in the erection, insulation and installation of its boilers. Foster Wheeler provided an "erection engineer" to oversee the assembly of its boilers and a "guarantee engineer" who was onboard the ship "during dock and sea trials." Dkt. No. 327-15 at 31. Thus, not only did Foster Wheeler know and expect that asbestos insulation would be used on its boilers to ensure their safe operation, it oversaw the assembly, insulation, and installation of its boilers.

As to Crane Co., it manufactured its valves with asbestos-containing gaskets and packing. *See* Dkt. No. 326-1 at ¶¶ 23, 27. Second, Crane Co. knew that the asbestos-containing packing in its valves would need to be replaced during the life of its valves and that a chisel, flat knife, wire

brush, or other tools would needed to be used to remove the packing because the asbestos would often bake into the valves. *See id.* at ¶ 29. Crane Co. even provided instructions for removing the packing from its valves. *See id.* at ¶ 26. Third, Crane Co. specified, marketed, and sold asbestos-containing replacement packing for use with its valves, *see id.* at ¶¶ 24, 28, and sold such replacement packing directly to the U.S. Navy for use in valves on Navy vessels. *See id.* at ¶ 25. Crane Co. even trademarked its own brand of packing and gaskets called "Cranite." *Id.* at ¶ 24. Furthermore, Crane Co. worked with the Navy on developing the Navy's 1946 manual entitled "Navy Machinery," which specified the use of asbestos with its valves on Navy ships. *See id.* at ¶ 25. Finally, Crane Co. specified the use of asbestos packing and gaskets in its valves that were installed in the number two fireroom on the USS Roan. *See id.* at ¶¶ 9-10.

This is in contrast to a situation where the asbestos-containing material at issue was used in proximity to the manufacturer's product, but the product was not specifically designed to incorporate asbestos. Under these circumstances, the hazard resulted only from the dangerous proximity of the products. As the California Supreme Court explained, manufacturers are not required to investigate and warn of "the potential risks of all other products" that might be used with their own product. *See Oneil*, 266 P.3d at 1004. The duty attaches only when the manufacturer incorporated the asbestos-containing material into its product, meaning that asbestos would inevitably be introduced into the stream of commerce along with the product.

Applying this distinction to the case at hand, the Court concludes that a reasonable jury could find facts that imposed upon Foster Wheeler and Crane Co. a duty to warn Mr. Osterhout about asbestos exposure resulting from the use of asbestos with its products, even if they did not actually supply the asbestos-containing material to which Mr. Osterhout was exposed. Plaintiff has pointed to evidence indicating that at least some of Crane Co.'s valves and the components of

Foster Wheeler's boilers needed asbestos-containing components to function properly in the high-heat applications on the USS Roan for which they were supplied.  Although Defendants argue that non-asbestos materials could be used with their products, nothing in the record indicates that such materials were suitable for high-heat applications.  Furthermore, even if replacement gaskets and packing were supplied by a third party, it is reasonable to infer that those replacement parts would have been substantially identical to the components originally supplied by Foster Wheeler and Crane Co.  Given these facts, a reasonable jury could find that Foster Wheeler and Crane Co. had a duty to warn about the hazards of asbestos exposure resulting from work on their products.

As the court noted in *Quirin*, this "conclusion differs from that reached by those courts that have relied on the 'bare metal defense' to strictly limit liability where a manufacturer did not make the actual product allegedly causing asbestos exposure.  It is not convinced, however, that a manufacturer should avoid liability on a failure-to-warn theory, where it designed its products to be used with asbestos-containing materials and actually incorporated asbestos-containing materials into the products it sold." *Quirin*, 17 F. Supp. 3d at 771.  On these facts, a jury could conclude that it was not just foreseeable, but inevitable, that the product would subject those working with it to the possible hazards of asbestos exposure and that the manufacturer of the product was in a position to warn of dangers apparent at the time the product was sold.  *See Sparkman v. Goulds Pumps, Inc.*, No. 2:12-cv-2957, 2015 WL 727937, *2-*3 (D.S.C. Feb. 19, 2015) (citation omitted).

Based on the foregoing, the Court denies Defendants motions for summary judgment on this ground.

### 2. New York law

Foster Wheeler contends that it is entitled to summary judgment as to all of Plaintiff's claims based on New York state law because it did not owe Plaintiff a duty with respect to other manufacturers' products, *i.e.*, insulation, gaskets and packing.  *See* Dkt. No. 310-32 at 12. Further, it claims that it did not have a duty to warn Mr. Osterhout "about the alleged hazards associated with the asbestos insulation manufactured and applied to its equipment by others, due to the fact that (1) Foster Wheeler had no control over the production of any of the asbestos insulation to which plaintiff alleged exposure; (2) Foster Wheeler had no role in placing any of the asbestos insulation to which plaintiff alleged asbestos exposure in the stream of commerce; (3) Foster Wheeler derived no benefit from the sale of the asbestos insulation to which plaintiff alleged asbestos exposure; and (4) Foster Wheeler's equipment did not create the alleged defect in the asbestos-containing insulation." *Id.*  Moreover, Foster Wheeler contends that Plaintiff improperly relies "on the *dicta* in the essentially one-paragraph opinion in *Berkowitz*, a lower [appellate court] case, decided prior to *Holdampf* [*v. A.C. & S., Inc.*, 5 N.Y.3d 486 (2005)]. . . ." Dkt. No. 310-32 at 27.  According to Foster Wheeler, "*Rastelli v. Goodyear* is controlling, and that similar to maritime law, a manufacturer-defendant has no duty to warn against defects in third-party products so long as the manufacturer had no control over the production of the defective product and did not place it into the stream of commerce."  *Id.* at 28.

Even if the Court were to analyze this case under New York law, the result would be the same.  *See, e.g., Berkowitz v. A.C. & S., Inc.*, 288 A.D.2d 148, 149 (1st Dep't 2001) (finding that, where there was evidence indicating defendant knew that asbestos insulation would likely be used on its pumps, it did not "necessarily appear that [the defendant] had no duty to warn concerning the dangers of asbestos that it neither manufactured or installed on its pumps"); *Gitto v.*

*Chesterton*, No. 7:07-cv-4771, 2010 WL 8752912, *2 (S.D.N.Y. Dec. 7, 2010). Foster Wheeler's

contentions regarding the *Berkowitz* decision have been repeatedly addressed in recent years. For

example, in *In re Eighth Judicial Dist. Asbestos Litig.*, 129 A.D.3d 1502 (4th Dep't 2015), the

defendant (Crane Co.) argued that, "because it did not produce or sell the component parts

containing asbestos, it did not place those parts into the stream of commerce and thus cannot be

liable for a failure to warn of the dangers associated with asbestos[.]" *Id.* at 1502-03 (citing

*Rastelli v. Goodyear Tire & Rubber Co.*, 79 N.Y.2d 289 (1992)). Rejecting the defendant's

arguments, the Fourth Department held as follows:

> It is well established that "a plaintiff may recover in strict products
> liability or negligence when a manufacturer fails to provide
> adequate warnings regarding the use of its product... A
> manufacturer has a duty to warn against latent dangers resulting
> from foreseeable uses of its products of which it knew or should
> have known". . . . Although the Court of Appeals determined that,
> under the facts presented in *Rastelli*, defendant Goodyear Tire &
> Rubber Co. was not liable for failing to warn about the potential
> dangers of mounting the tire on a multipiece rim, we conclude that
> the same result is not mandated here. . . . Even assuming, arguendo,
> that defendant met its initial burden of establishing that its valves
> did not require components containing asbestos in order to perform
> as intended, we conclude that plaintiff raised an issue of fact
> whether defendant knew that components that did not contain
> asbestos would be unable to withstand the heat for the intended
> purpose of the valve when used in high pressure steam lines, that it
> intended that component parts containing asbestos would be used
> for that purpose, and thus that the exposure to asbestos when
> replacing those components to ensure that the valves functioned
> properly was foreseeable[.]

*Id.* (internal quotation and citation omitted).

The issue was again considered by the First Department in *In re N.Y.C. Asbestos Litig.*,

121 A.D.3d 230 (1st Dep't 2014). In this decision, the court considered numerous issues on

appeal after a jury verdict against numerous defendants, including valve manufacturer Crane Co.,

which challenged the trial court's use of the word "foreseeability" in its instructions to the jury.

The Appellate Division upheld the verdict and found that, while "mere foreseeability is not sufficient," it remains that "[t]here is a place for the notion of foreseeability in failure to warn cases where, as here, the manufacturer of an otherwise safe product purposely promotes the use of that product with components manufactured by others that it knows not to be safe." *Id.* at 252. In doing so, it explicitly rejected the valve manufacturer's assertion of the "component parts doctrine." *Id.* Specifically, the court held that "the component parts doctrine does not absolve Crane here because the evidence showed that Crane itself promoted its valves for use with asbestos parts, which could not be considered inherently safe." *Id.*

Several recent trial court decisions from federal courts in New York have also held that a product manufacturer can be held liable for injury from a third-party-produced asbestos-containing component part used with its product if the defendant intended or knew that such asbestos components would be used with its products. *Curry v. American Standard*, No. 7:08-cv-10228 (S.D.N.Y. Dec. 6, 2010); *Gitto v. Chesterton*, No. 7:07-cv-04771, 2010 WL 8752912 (S.D.N.Y. Dec. 7, 2010); *Surre v. Foster Wheeler LLC*, 831 F. Supp. 2d 797 (S.D.N.Y. 2011). In *Gitto*, the district court found "that a manufacturer's liability for third-party produced component parts must be determined by the degree to which injury from the component parts is foreseeable to the manufacturer." *Gitto*, 2010 WL 8752912, at *2. Relying in part on comment "h" to the Restatement (Second) of Torts, *Surre* clarified further that a "manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of its product of which it knew or should have known." *Surre*, 831 F. Supp. 2d at 800. The *Surre* court clarified that this could include warning about hazards of third-party-produced component parts used with its products if, for example, the product manufacturer knew its product would be used with hazardous component parts, such as where use of such hazardous component part is necessary for the

product to function.  *See id.* at 801.

Contrary to Foster Wheeler's contentions, the *Berkowitz* does not conflict with *Rastelli*. Rather, these divergent holdings rest on consistent application of the same foreseeability principle.  Accordingly, Defendants' motions for summary judgment on this ground are denied.

**E.     "Substantial factor" requirement**

Foster Wheeler contends that it is entitled to summary judgment because, under maritime law, Plaintiff cannot establish that any product manufactured or supplied by Foster Wheeler was a substantial factor in Mr. Osterhout's alleged injury.  *See* Dkt. No. 310-32 at 25-26.

In order to establish causation for an asbestos claim under maritime law, a plaintiff must show, for each defendant, that "(1) he was exposed to the defendant's product, and (2) the product was a substantial factor in causing the injury he suffered." *Lindstrom v. A-C Prod. Liab. Trust*, 424 F.3d 488, 492 (6th Cir. 2005) (citing *Stark v. Armstrong World Indus., Inc.*, 21 Fed. Appx. 371, 375 (6th Cir. 2001)).  Substantial factor causation is determined with respect to each defendant separately.  *See Stark*, 21 Fed. Appx. at 375.

Accordingly, a mere "minimal exposure" to a defendant's product is insufficient to establish causation.  *Lindstrom*, 424 F.3d at 492.  "Likewise, a mere showing that defendant's product was present somewhere at plaintiff's place of work is insufficient." *Id.*  Rather, the plaintiff must show "'a high enough level of exposure that an inference that the asbestos was a substantial factor in the injury is more than conjectural.'" *Id.* (quoting *Harbour v. Armstrong World Indus., Inc.*, 932 F.2d 968 (6th Cir. 1991)).  The exposure must have been "actual" or "real," but the question of "substantiality" is one of degree normally best left to the factfinder. *Redland Soccer Club, Inc. v. Dep't of Army of U.S.*, 55 F.3d 827, 851 (3d Cir. 1995).  "Total

failure to show that the defect caused or contributed to the accident will foreclose as a matter of law a finding of strict products liability." *Stark*, 21 Fed. Appx. at 376 (citing *Matthews v. Hyster Co., Inc.*, 854 F.2d 1166, 1168 (9th Cir. 1988) (citing Restatement (Second) of Torts, § 402A (1965))).

In *Caruolo v. John Crane, Inc.*, 226 F.3d 46 (2d Cir. 2000), the court articulated the causation standard as follows: "'It's not necessary for a defendant's product to be the sole or even the dominant cause of such injuries in order to be considered proximate cause. . . . Where more than one factor operates separately or together with others to cause an injury or disease, each may be a proximate cause if it is a substantial factor in bringing about that injury.'" *Id.* at 56 (citation omitted).

In the present matter, questions of fact prevent the Court form granting Defendants' motions for summary judgment on this ground. Plaintiff's medical causation expert, Dr. Steven Markowitz, M.D., opined that Mr. Osterhout's exposure to asbestos from the replacement of gaskets on Foster Wheeler's boilers was a substantial contributing factor in the development of his mesothelioma. *See* Dkt. No. 327-1 at ¶ 49. Dr. Markowitz explained that the only established cause of mesothelioma, from which Mr. Osterhout suffered, is asbestos exposure. *See id.* at ¶ 51. He further explains that while there are three main types of asbestos fibers, exposure to chrysotile asbestos, alone or in combination with other fiber types, is an established cause of mesothelioma. *See id.* According to Dr. Markowitz, there is no "threshold" level of asbestos exposure "below which a person will not sustain an increased risk of developing mesothelioma" and "studies have repeatedly demonstrated a significantly increased risk of mesothelioma from low-levels of cumulative asbestos exposure." *Id.* at ¶ 52. In fact, Foster Wheeler's Navy and medical expert, Dr. L.S. Betts agrees: "And we know for a fact that people get malignant mesothelioma, can get

malignant mesothelioma, with no stigmata of asbestos exposures because they get the disease from a very, very small level of asbestos, a very small concentration or a short-term exposure." *Id.* (emphasis omitted).[6]

Dr. Markowitz explained that since asbestos fibers are microscopic, "if a worker reports seeing visible dust from an asbestos-containing product, this indicates that there is likely to be a significant amount of asbestos in the air and, additionally, that there are many more asbestos fibers in the air that may not be visible." Dkt. No. 327-1 at ¶ 53 (quoting Ex. 26 at ¶ 27). Additionally, according to Dr. Markowitz, a myriad of published studies and literature demonstrate that "significant levels of asbestos fibers are released into the air when asbestos-containing gaskets and packing are removed." *Id.* These studies demonstrate that not only is there significant exposure to the individual actually removing the gaskets or packing, but also to bystanders (others working in the vicinity). *See id.* Dr. Markowitz contends that the asbestos fibers released from the removal of asbestos-containing gaskets and/or packing is sufficient to cause mesothelioma. *See id.*

Dr. Markowitz reviewed Mr. Osterhout's testimony regarding his work, and the work of other sailors in his vicinity, on the boilers in the after fireroom on the USS Roan. Specifically, he summarized Mr. Osterhout's testimony with regard to the gaskets that either Mr. Osterhout, or other sailors in his vicinity, constantly removed from the boilers. *See* Dkt. No. 327-39 at ¶ 45. Dr. Markowitz detailed how the gaskets, particularly the manhole gaskets, which were stuck or fused to the boilers, were removed from the boiler using either a scrapper or a wire brush and

---

[6] The Court notes that Foster Wheeler denies this assertion. *See* Dkt. No. 342-1 at ¶ 52. Without citation to the record, Foster Wheeler states as follows: "Denied. Everyone living in an urban environment is exposed to asbestos on a daily basis, yet most people never get mesothelioma. Accordingly, there is a level of asbestos exposure below which people do not get mesothelioma." *Id.*

how, according to Mr. Osterhout, the removal process created visible dust. *See id.*

Based on this evidence, the Court finds that questions of fact preclude granting Defendants' motions for summary judgment on this ground.[7]

### F.    Defendants' motions to preclude the testimony of Dr. Steven Markowitz

Defendant Crane Co. moves to exclude the testimony of Plaintiff's medical causation expert, Dr. Steven Markowitz, on the following grounds: (1) Plaintiff has failed to disclose the substance of any opinions specific to Crane Co.; (2) there is no factual foundation for Dr. Markowitz to provide hypothetical testimony regarding Crane Co.; and (3) any hypothetical testimony Dr. Markowitz may offer regarding specific causation would be based on a methodology that runs afoul of *Daubert*. *See* Dkt. No. 308-2. Similarly, Defendants CBS Corporation ("Westinghouse")[8] and Foster Wheeler move to exclude Dr. Markowitz's testimony on the following grounds: (1) the "cumulative exposure" opinion fails to satisfy Rules 401, 402 and 403 of the Federal Rules of Evidence; (2) the "cumulative exposure" opinion will not help the trier of fact understand the evidence or determine a fact issue; (3) the "cumulative exposure" opinion as to Westinghouse and Foster Wheeler is not based on any facts or data; (4) the "cumulative exposure" opinion is not the product of reliable principles and methods; (5) Dr. Markowitz is incapable of establishing that he has reliably applied the principles and methods to

---

[7] The Court notes that Defendants take issue with many of Dr. Markowitz assertions and conclusions. *See, e.g.,* Dkt. No. 342-1 at ¶¶ 49-54. As discussed in more detail below, the arguments made, for the most part, go to the weight that should be given to Dr. Markowitz's opinions, not to their admissibility.

[8] After filing their motion to exclude the testimony of Dr. Markowitz, Plaintiff and Defendant CBS Corporation/Westinghouse entered into a stipulation and order of discontinuance with prejudice. *See* Dkt. No. 319. Accordingly, the Court will address the pending motion only as it relates to Defendant Foster Wheeler.

the facts of this case; and (6) Dr. Markowitz's opinion is not based on facts or data that are reasonably relied upon pursuant to Rule 703 of the Federal Rules of Evidence.  *See* Dkt. No. 15.

As discussed, Foster Wheeler manufactured the boilers aboard the USS Roan.  During Dr. Markowitz's deposition, he testified that Mr. Osterhout alleged exposure to the following four alleged asbestos-containing components with respect to the Foster Wheeler boilers: "[1.] a gasket around the man door and maybe another gasket. I don't recall that detail. [2.] I believe he referred to insulation on the boiler and [3.] then within the boiler he discussed firebrick and . . . [4.] mortar that was covering that firebrick."  Dkt. No. 312-2 at 17-18.

Plaintiff's naval expert Captain Moore confirmed that Foster Wheeler did not provide any exterior insulation for the boiler and that the firebrick did not contain asbestos.  *See* Dkt. No. 312-4 at 10-11.  Captain Moore also confirmed that the mortar was made out of firebrick, not asbestos. *See id.*  As such, Foster Wheeler contends that three of the four components that formed the basis of Dr. Markowitz's opinion regarding Mr. Osterhout's "cumulative" exposure to asbestos attributable to Foster Wheeler were either non-asbestos or not supplied by Foster Wheeler.  *See* Dkt. No. 315 at 12.  Therefore, Foster Wheeler argues that the only asbestos-containing component allegedly at issue with the Foster Wheeler boiler is the manhole gasket.  *See id.*  Mr. Osterhout testified that he performed manhole gasket jobs associated with the Foster Wheeler boiler "a couple of times[.]" Dkt. No. 312-5 at 133.

Foster Wheeler contends that Dr. Markowitz "did not know anything about the fiber type used in the manhole gaskets" or the dimensions of the manhole gaskets.  *See* Dkt. No. 315 at 12 (citing Dkt. No. 312-2 at 18).  Further, Foster Wheeler claims that Dr. Markowitz "did not know anything about the actual fiber release from those manhole gaskets."  *Id.* (citing Dkt. No. 312-2 at

18).[9]

### 1. Standard

The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility of certain forecasted evidence. *See Luce v. United States*, 469 U.S. 38, 40 n.2 (1984); *see also Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996). A court should exclude evidence on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds. *See Baxter Diagnostics, Inc. v. Novatek Med., Inc.,* No. 94–cv–5220, 1998 WL 665138, *3 (S.D.N.Y. Sept. 25, 1998). Courts considering a motion *in limine* may reserve decision until trial so that the motion is placed in the appropriate factual context. *See Nat'l Union Fire Ins. Co. v. L.E. Myers Co. Group*, 937 F. Supp. 276, 287 (S.D.N.Y. 1996). Alternatively, the court is "free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling" at trial as "the case unfolds, particularly if the actual testimony differs from what was contained in the [movant's] proffer." *Luce*, 469 U.S. at 41–42.

---

[9] In its reply to Plaintiff's response to the motion *in limine*, Foster Wheeler contends that Plaintiff improperly submitted a new affidavit from Dr. Markowitz, created well after Dr. Markowitz prepared his expert report and after his deposition. *See* Dkt. No. 341 at 5-6. Foster Wheeler argues that this affidavit "is nothing more than a belated attempt to serve a supplemental report after discovery has closed, without leave of court, disguised as an affidavit." *Id.* Foster Wheeler claims that, with the exception of two previously disclosed exhibits, the exhibits relied upon by Plaintiff in their opposition fall outside the scope of Plaintiff's Rule 26 disclosure statement and were not previously supplied in advance of Dr. Markowitz's deposition as documents he relied upon. *See id.* As such, Foster Wheeler asks that the Court either strike these documents or, in the alternative, reopen discovery for the limited purpose of deposing Dr. Markowitz. *See id.* at 5-6 n.1.

Since the Court finds that these belatedly disclosed documents are unnecessary for the disposition of the pending motions *in limine*, they will not be considered.

### 2. Dr. Markowitz's "cumulative exposure" opinion satisfies Rules 401, 402 & 403

Defendant Foster Wheeler contends that Dr. Markowitz's "cumulative exposure" opinion fails to satisfy Rule 401, 402 and 403 of the Federal Rules of Evidence.  *See* Dkt. No. 315 at 15-16.  Specifically, Foster Wheeler contends that, "although Dr. Markowitz' acknowledges that asbestos-related mesothelioma is a dose-response disease, he knows nothing about decedent's actual dose of asbestos, and more importantly, knows nothing about the actual dose, if any, attributable to Westinghouse or Foster Wheeler.  Despite that Dr. Markowitz acknowledges that different types of asbestos fibers have greater toxicity than others, Dr. Markowitz doesn't even know which types of asbestos fibers, if any, are at issue with respect to Westinghouse and Foster Wheeler." *Id.*  Further, Foster Wheeler argues that "[e]ven if this Court were to find Dr. Markowitz' testimony relevant, it would still fail to meet the rigors Fed. R. Evid. § 403 because its probative value (whether decedent's mesothelioma was caused by decedent's 'cumulative exposure' to asbestos) 'is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence,' . . . since Dr. Markowitz is unable to provide specific causation testimony about Westinghouse and Foster Wheeler." *Id.* at 16.

Foster Wheeler is correct that Dr. Markowitz "knows nothing about the actual dose [of asbestos], if any, attributable to Westinghouse or Foster Wheeler."  Considering that the exposure occurred between 1947 and 1951, how could he have such specific knowledge?  Most of Foster Wheeler's arguments are premised on the arguments that it made in support of its motion for summary judgment, *i.e.*, they are not responsible for asbestos exposure from products that were subsequently used on their boilers that they did not provide or produce.  The Court, however, rejected those arguments.  Further, in admitting similar expert testimony, other courts have held

that, "in cases of occupational or environmental exposure, 'it is usually difficult, if not impossible, to quantify the amount of exposure.'" *Quirin v. Lorillard Tobacco Co.*, No. 13-cv-2633, 2014 WL 716162 (N.D. Ill. Feb. 25, 2014) (quoting *Bombardiere v. Schlumberger Tech. Corp.*, 934 F. Supp. 2d 843 (N.D. W. Va. 2013) (quoting FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 187 (1994))).

Dr. Markowitz testified that he reviewed Mr. Osterhout's testimony regarding his exposure to asbestos while in the Navy. *See* Dkt. No. 312-2 at 27. He specifically discussed the fact that Mr. Osterhout frequently removed and replaced packing, which was part of his regular job. *See id.* Further he testified that Mr. Osterhout was exposed to asbestos while in close proximity to others who were performing such tasks. *See id.* Given that the packing contained asbestos, these activities "represented an opportunity for airborne exposure on a repeated basis over at least a couple of years." *Id.* According to Dr. Markowitz, this repeated exposure constituted a "significant part of his cumulative exposure." *Id.*

Moreover, in discussing what cumulative exposure means, Dr. Markowitz provide the following testimony:

> Q. Well, you said significant part means it contributed to the cumulative.
>
> A. Right.
>
> Q. So do we know how much it contributed to the cumulative in terms of dose or quantity or any way you can put it as an occupational medicine professional?
>
> A. No, no, I mean, certainly not numerically. I can't say that it contributed thirty percent or anything like that.
>
> Q. Just that it contributed?
>
> A. Well, that it was – I believe that it was a substantial contributing factor to his exposure to cancer.

38

Q.      What does that mean, substantial contributing factor?

A.      It means that it played a role in his developing mesothelioma, most likely.

Q.      How does one, and when I say one, a doctor, determine a substantial contributing factor?

A.      I can't comment on how it's done in general.

Q.      That's a good point.  How do you, Dr. Markowitz, determine that?

A.      So in this case or in any case I'm looking at the opportunity for exposure to a product that likely contained asbestos, the opportunity for that product to become airborne, produce airborne dust by the individual himself or herself or by coworkers in the vicinity of the person with the asbestos-related disease and that it be done over a reasonable period of time on a regular basis within a period of time that satisfies the criteria of latency.

                              * * * * *

Q.      In the context of exposures, how are you, Dr. Markowitz, defining substantial?

A.      Well, in the occupational environment, I'm looking at duration, frequency and intensity, and based on the criteria I mentioned before, I'm going to define something as substantial if it meets those criteria.

Dkt. No. 312-2 at 27-28.  Dr. Markowitz further testified that, based on his review of the record, Mr. Osterhout's exposure to asbestos while serving in the Navy aboard the USS qualified as a substantial contributing factor to his injury.  *See id.* at 28.  This testimony is sufficiently relevant and its probative value outweighs its prejudicial value.  *See In re Joint E. & S. Dist. Asbestos Litig.*, 964 F.2d 92 (2d Cir. 1992); *see also Anderson v. Saberhagen Holdings, Inc.*, MDL No. 875, 2011 WL 605801, *6-*7 (E.D. Pa. Feb. 16, 2011) (permitting the plaintiff to introduce substantially similar "cumulative exposure" testimony and finding that the defendant's arguments

39

for preclusion are more appropriately reserved for cross examination); *Cabasug v. Crane Co.*, 989 F. Supp. 2d 1027, 1037-38 (D. Haw. 2013).

Based on the foregoing, the Court denies Defendants' motions *in limine* on this ground.


### 3. *"Cumulative exposure" opinion will help the trier of fact*

Next, Defendants contend that "'cumulative exposure' is not the legal causation standard applicable to this case." Dkt. No. 315 at 16. Rather, Foster Wheeler contends that "'substantial contributing factor'" is the test for asbestos causation. *Id.* at 17 (citing *Lindstrom v. A-C Prod. Liability Trust*, 424 F.3d 488, 493 (6th Cir. 2005)).

In *Lindstrom*, the court held that the medical expert's affidavit was insufficient to establish that any of the defendants were a substantial contributing factor in causing the plaintiff's mesothelioma. *See Lindstrom*, 424 F.3d at 493. This holding was based in large part on the fact that the *Lindstrom* court strictly applied the "bare metal defense," in a case that did not involve a failure to warn claim. As discussed above, however, the Court has declined to apply such a rigid approach. As such, the Court finds that the *Lindstrom* court's holding is inapplicable to the present matter.

Here, Dr. Markowitz's contends that, based on the nature of Mr. Osterhout's work in the Navy, his repeated exposure to asbestos while working in the fire room, was a substantial contributing factor to his injury. Although Dr. Markowitz's testimony does not specifically identify what products created the airborne asbestos, other evidence clearly indicates that a substantial portion of the airborne asbestos in the fireroom came from asbestos provided by Crane Co. and asbestos-containing material placed on Foster Wheeler's boilers.

Based on the foregoing, the Court denies Defendants' motions *in limine* on this ground.

### 4. Dr. Markowitz's testimony satisfies Daubert

Defendants next contend that Dr. Markowitz's "cumulative exposure" testimony fails to satisfy *Daubert*. First, Foster Wheeler contends that Dr. Markowitz's "opinion fails from the start because he acknowledges that asbestos-related mesothelioma is a dose-responsive disease." Dkt. No. 315 at 18. Dr. Markowitz, however, conceded that he "'never reconstruct[s] doses quantitatively,' . . . his 'purpose is not to look at a particular product or a particular company,' . . . he doesn't know whether 'there's a level of exposure to asbestos below which there's no risk of mesothelioma,' . . . and he wasn't even aware of which components within the Westinghouse and Foster Wheeler equipment allegedly contained asbestos." Dkt. No. 315 at 18-19.

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence. That Rule provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

In reviewing the admissibility of expert testimony, "the district court has a 'gatekeeping' function under Rule 702 – it is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S. Ct. 2786 (1993)). The rule set forth in *Daubert* applies to scientific knowledge, as well as technical or other specialized knowledge. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

As the Second Circuit has explained,

> [i]n fulfilling this gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, *i.e.*, whether it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.  Next, the district court must determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered.  In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case.  In short, the district court must make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*Amorgianos*, 303 F.3d at 265 (internal alterations, quotations, and citations omitted).  The court must also consider the fact that "experience in conjunction with other knowledge, skill, training or education . . . [may] provide a sufficient foundation for expert testimony," and "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702; *see also Kumho Tire*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience").

"In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions."  *Amorgianos*, 303 F.3d at 266 (citation omitted).  "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and

methods to the case at hand." *Id.* "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible." *Id.* "'The judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions.'" *Id.* (quotation and other citation omitted).

As the courts and Advisory Committee have made clear, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Committee's Note; *see also E.E.O.C. v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451, 456 (S.D.N.Y. 2004); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, 313 F. Supp. 2d 213, 226 (S.D.N.Y. 2004). "This principle is based on the recognition that 'our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony.'" *Melini*, 2009 WL 413608, at *5 (quoting *Amorgianos*, 303 F.3d at 267).

However, "when an expert opinion is based on data, methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266; *accord Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005). Furthermore, "it is critical that an expert's analysis be reliable at every step." *Amorgianos*, 303 F.3d at 267. Of course, "the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Id.* at 266 (citing *Daubert*, 509 U.S. at 595). Nevertheless, "conclusions and methodology are not entirely distinct from one another." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Accordingly, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146.

In the present matter, Defendants essentially argue that Dr. Markowitz's opinions are not

based upon sufficient facts or data and are therefore unsupported and unreliable. The Court disagrees.

In his report, Dr. Markowitz indicates that he reviewed Mr. Osterhout's various medical records from 2004 through 2014, Plaintiff's first amended answer to Defendants' standard interrogatories, the complaint, and Mr. Osterhout's depositions dated May 8, 2014 (video deposition) and March 12, 13 and 14, 2014 (discovery depositions). Dkt. No. 312-1 at 1. Dr. Markowitz summarizes Mr. Osterhout's relevant medical history and his previous tobacco use. *See id.* at 2-3. Further, the report contains a summary of Mr. Osterhout's occupational and military history, which included exposure to asbestos. Considering the scope of Dr. Markowitz's anticipated testimony and his extensive education and experience in this field, the Court finds that the information on which his report and opinions are based is sufficient. *See Neureuther v. Atlas Copco Compressors, LLC*, No. 13-cv-1327, 2015 WL 4978448, *2 (S.D. Ill. Aug. 20, 2015).

As to Defendants' challenges to the theoretical basis for Dr. Markowitz's opinion, the Court finds that their motions must be denied. In *Neureuther*, the defendant argued that the plaintiff's expert relied on an "each and every exposure" theory to support his finding of asbestosis and argued that the expert's opinions should be excluded because "this theory has not been accepted in the relevant community, is not capable of being tested and has an unknown rate of error." *Neureuther*, 2015 WL 4978448, at *3. Rejecting the defendant's arguments, the court first noted that some courts have rejected the "every exposure" theory as unscientific and unsubstantiated. *Id.* (citing *Lindstrom v. A-C Prods. Liab. Trust*, 424 F.3d 488, 492-93 (6th Cir. 2005)) (other citations omitted). Significantly, however, the court noted that other courts "have distinguished testimony suggesting that a *de minimus* exposure to asbestos could cause mesothelioma (rejected by the cases cited above) from testimony that each *significant* exposure to

44

asbestos could be a cause." *Id.* (citing *Dixon v. Ford Motor Co.*, 70 A.3d 328 (Md. App. Ct.

2013); *In re Asbestos Prods. Liab. Litig.*, 2011 WL 605801, *7 (E.D. Pa. Feb. 16, 2011))

(emphasis in original).  Further, the court noted that courts have routinely accepted the fact that

"'mesothelioma can result from minor exposures to asbestos products'" which is routinely

established through "'medical testimony, OSHA regulations, and EPA regulations.'" *Id.* at *4

(quoting *Tragarz v. Keene Corp.*, 980 F.2d 411 (7th Cir. 1992)).  Denying the defendant's motion,

the court concluded as follows:

> Dr. Vuskovich does state that asbestosis is a cumulative disease,
> which 'means that every exposure to asbestos contributes to the
> interstitial scarring in the lungs, which is asbestosis' . . .  He also
> states, 'it is not possible to say, within a reasonable degree of
> medical certainty, what the threshold exposure requirement is for
> asbestosis.' . . .  His opinion, however, takes into account Plaintiff's
> occupational history, and his ultimate conclusion is that Plaintiff's
> exposures were not trivial.  The Court finds nothing scientifically
> invalid about Dr. Vuskovich's theory under *Daubert*, nor any
> unjustifiable extrapolations cautioned against by the Rule 702
> advisory committee.

*Id.* at *4.

In the present matter, the Court finds that Defendants' motions must be denied.  There is

nothing scientifically invalid about Dr. Markowitz's theories under *Daubert*.  Contrary to

Defendants' contentions, the Court finds that Dr. Markowitz's "cumulative exposure" theory is

sufficiently reliable to meet the admissibility standard of Rule 702 and Defendants' arguments to

the contrary are more appropriately reserved for cross examination.  *See Anderson v. Saberhagen*

*Holdings, Inc.*, MDL No. 875, 2011 WL 605801 (E.D. Pa. Feb. 16, 2011) (rejecting the

defendant's *Daubert* motion, based on facts substantially similar to the present matter and finding

that the arguments are more appropriately reserved for cross examination); *see also Caruolo v.*

*John Crane, Inc.*, 226 F.3d 46,53-54 (2d Cir. 2000) (holding that, despite the fact that Dr.

Markowitz's testimony was undermined through his concessions and the defendant's experts, the district court properly denied the defendant's motion for judgment as a matter of law because it was "up to the jury to decide which testimony to credit and discredit").

### 5. Foundation for Dr. Markowitz to provide hypothetical testimony regarding Crane Co.

Defendant Crane Co. contends that there is no factual foundation for Dr. Markowitz to provide hypothetical testimony regarding Crane Co. *See* Dkt. No. 308-2 at 6. Specifically, Crane Co. contends that "because there is no evidence to substantiate the testimony provided, Dr. Markowitz's opinions are irrelevant and would only serve to mislead and confuse the jury and prejudice Crane Co." *Id.*

Contrary to Crane Co.'s assertions, as discussed in relation to Defendants' motions for summary judgment, the evidence in this case clearly demonstrates that Crane Co. manufactured valves that were used in the fireroom aboard the USS Roan in which Mr. Osterhout served and that those valves contained asbestos-containing packing. It is entirely consistent with the Federal Rules for Dr. Markowitz to rely upon a hypothetical at trial which asks him to assume what the evidence demonstrates: that Crane Co. manufactured some of the asbestos-containing valves used in the fireroom where Mr. Osterhout served, particularly since Crane Co. is aware of, and has questioned Dr. Markowitz about his opinions about Mr. Osterhout's exposure to asbestos from valves.

Based on the foregoing, the Court denies Defendant Crane Co.'s motion *in limine* on this ground.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the

applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** Defendants' motions for summary judgment (Dkt. Nos. 305 and 309) are

**DENIED**; and the Court further

**ORDERS** that Defendants' motions *in limine* seeking to preclude the testimony of Dr.

Steven Markowitz (Dkt. Nos. 308 and 311) are **DENIED**; and the Court further

**ORDERS** that Plaintiff's letter motion requesting oral argument (Dkt. No. 346) is

**DENIED** as moot; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision

and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 21, 2016
        Albany, New York

Mae A. D'Agostino
U.S. District Judge